Filing # 145571521 E-Filed 03/11/2022 03:48:26 PM

IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
IN AND FOR SARASOTA COUNTY FLORIDA
CIVIL DIVISION

PETER HATT-LIPSCOMB,

               Plaintiff,

   v.

BAYSIDE ORTHOPAEDICS, INC.;
MATTHEW N. BROWER; RONALD T. COOK;
MEDICAL DEVICE BUSINESS SERVICES,
INCORPORATED (f/k/a DEPUY, INC.;
DEPUY ORTHOPEDICS, INC.; and DEPUY
ORTHOPAEDICS, INC.); DEPUY SYNTHES
SALES, INCORPORATED; JOHNSON &
JOHNSON SERVICES, INCORPORATED;
and JOHNSON & JOHNSON,

               Defendants.

**CASE NO. 2022 CA 000817 NC**

**COMPLAINT FOR PERSONAL
INJURY**

**JURY TRIAL DEMANDED**

## AMENDED COMPLAINT FOR DAMAGES
## AND DEMAND FOR JURY TRIAL

COMES NOW, the Plaintiff, PETER HATT-LIPSCOMB,, by and through

Plaintiff's undersigned attorneys and files this Amended Complaint against

BAYSIDE ORTHOPAEDICS, INC. a Florida Corporation, now dissolved,

MATTHEW N. BROWER, a Florida citizen, and RONALD T. COOK, a Florida

citizen (hereafter collectively referred to herein as "Distributor" or "Distributor

Defendants"); and against various corporations comprising Johnson & Johnson,

including: MEDICAL DEVICE BUSINESS SERVICES, INC., a foreign for-profit

corporation registered to do business in Florida and formerly known as DePuy, Inc.,

DePuy Orthopedics, Inc., and DePuy Orthopaedics, Inc. ("MDBS"); DEPUY

1

SYNTHES SALES, INC., a foreign for-profit corporation registered to do business in Florida ("DSS"); JOHNSON & JOHNSON SERVICES, INC. ("JJS"), a foreign for-profit corporation registered to do business in Florida; and JOHNSON & JOHNSON, a foreign for-profit corporation ("Johnson & Johnson;" MDBS, DSS, JJS, and Johnson & Johnson collectively referred to herein as "J&J" or "J&J Defendants"); and alleges as follows:

# TABLE OF CONTENTS

A.  Metal on metal hip replacements were tried and abandoned decades ago. _____ 15

B.  J&J used a loophole to revive metal on metal hip replacements and avoid testing for known dangers. _____ 16

C.  Premarket testing for safety and efficacy would have revealed the unreasonable risk of heavy metal toxicity. _____ 16

D.  The Pinnacle hip system is unsafe. _____ 18

E.  J&J and Distributor misrepresented the Pinnacle to sell to more active patients when, in fact, the Pinnacle was even more dangerous for active patients. _____ 20

F.  J&J and Distributor misrepresented the Pinnacle's ability to "lubricate" the moving parts. _____ 21

G.  J&J and Distributor misrepresented that the Pinnacle has 99.9% survivorship. _____ 23

H.  J&J and Distributor advocated an unproven theory to minimize concern regarding long-term wear. _____ 24

I.  Distributor, specifically, proliferated the myths of lubrication, run in wear, and  99.9% survivorship with the Pinnacle. _____ 26

J.  Distributor earned hundreds of thousands, if not millions of dollars in commissions from selling the Pinnacle and ASR MoM Systems. _____ 27

K.  Distributor was highly trained regarding the Pinnacle in order to earn the lofty commissions from its sale. _____ 28

L.  Distributor attends surgeries to provide components, surgical tools, and to assist and troubleshoot with the surgical team during the surgery. _____ 31

M.  Distributor omitted critical information in its independent knowledge regarding failed MoM implants. _____ 32

N.  When their "Substantially Equivalent" ASR hip system was recalled because of high failure rates, J&J doubled down on selling the Pinnacle and concealing its problems instead of investigating and recalling the Pinnacle. _____ 35

O.  Distributor took part in the recall of the ASR yet failed to inform surgeons of the same risks with the Pinnacle. _____ 39

**P.   Distributor was intricately involved in the sale and implant of Plaintiff's Pinnacle.** _____ **40**

# I.    PARTIES

1.    At all times relevant to this complaint, Plaintiff PETER HATT-LIPSCOMB, was a resident of Florida.

2.    At all times relevant to this complaint, BAYSIDE ORTHOPAEDICS, INC., was a Florida corporation having a principal place of business at 614 Coral Drive Cape Coral, FL 33904.

3.    As of 09/22/2019 BAYSIDE ORTHOPAEDICS, INC., was administratively dissolved.

4.    At all times relevant to this complaint, MATTHEW N. BROWER is and was a Florida citizen residing in Sarasota County, Florida at 2405 Isle of Palms Dr. Venice, FL 34292.

5.    At all times relevant to this complaint, RONALD T. COOK is and was a Florida citizen residing in Lee County, Florida at 947 S Town and River Dr. Fort Myers, FL 33919.

6.    BAYSIDE ORTHOPAEDICS, INC., MATTHEW N. BROWER, and RONALD T. COOK, (the "Distributor Defendants") are Florida based defendants who have previously been named as defendants in Florida courts in numerous matters involving similar metal on metal implants.[1]

---

[1] On multiple occasions, the U.S. District Court for the Middle District of Florida has held that these same Distributor Defendants can be strictly liable for product defects and has granted remand motions over the J&J Defendants' fraudulent joinder objections. *See e.g. Fronczak v. Depuy Orthopaedics, Inc.*, 8:14-CV-2162-T-30MAP, 2014 WL 5175857, at *1 (M.D. Fla. Oct. 14, 2014). *See also, Barnes v. Bayside Orthopaedics, Inc.*, Case No. 8:11–cv–2827–T–30EAJ, 2012 WL 162368 (M.D.Fla. Jan. 19, 2012). *See also, Brush v. Bayside Orthopaedics, Inc.*, 8:14-CV-2163-CEH-EAJ, 2014

7.    MDBS is a foreign for-profit corporation registered to do business in the State of Florida, was formerly known as DePuy, Inc., DePuy Orthopedics, Inc., and DePuy Orthopaedics, Inc. with its principal place of business listed as 700 Orthopaedic Drive, Warsaw, Indiana 46582.

8.    DSS is a foreign for-profit corporation registered to do business in the State of Florida, with its principal place of business listed as 325 Paramount Drive, Raynham, Massachusetts 02767.

9.    JJS is a foreign for-profit corporation registered to do business in the State of Florida, with its principal place of business listed as One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933.

10.    Johnson & Johnson is, and at all times relevant to this Complaint was, a New Jersey Corporation with its principal place of business at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933, and is and was the parent company of MDBS, DSS, and JJS.  Johnson & Johnson is and was at all times relevant to this complaint doing business in and directed its activities at the State of Florida, the state where Plaintiff resided at all times relevant to this Complaint. Despite this, Johnson & Johnson has not registered to do business in the State of Florida.

---

WL 5426643 (M.D. Fla. Oct. 22, 2014)). *See also Kruzynski v. Bayside Orthopaedics, Inc.*, 8:14-CV-2165-SDM-TBM, (M.D. Fla. Oct. 22, 2014).

## II.   JURISDICTION AND VENUE

11.   Jurisdiction is proper in the courts of the State of Florida because MATTHEW N. BROWER and RONALD T. COOK are residents of Florida, and the Plaintiff was implanted with the defective and dangerous product in Florida.

12.   Venue for this action is proper in Sarasota County, Florida because Defendant MATTHEW N. BROWER resides in Sarasota County, Florida.[2]

### III.   SUMMARY

13.   This is a lawsuit involving a defective metal on metal ("MoM") hip replacement system and components designed, manufactured, promoted, marketed, distributed, sold, serviced, and supported by J&J, and promoted, marketed, distributed, sold, serviced, and supported by Distributor.

14.   The particular system at issue in this case was marketed as the "DePuy Pinnacle MoM hip replacement system."

15.   J&J designed and manufactured the MoM Pinnacle system.  J&J also previously designed and manufactured another MoM hip system called the Articular Surface Replacement, or "ASR."  Both systems were made with articulating components made of the same or materially similar Cobalt Chrome alloy.

16.   J&J, directly and/or through the actions of its subsidiaries, has at all pertinent times participated in developing the product, greenlighted its sale worldwide, held the product out as its own, independently promoted the product,

---

[2] All Defendants are aware that the Distributor Defe

exercised ultimate controlling authority over the product's design and promotion, sold the product and derived revenue from its sale such that it is the responsible authority over the research, development, testing, manufacture, production, marketing, promotion, distribution and/or sale of the product at issue in this litigation, known as the DePuy Pinnacle MoM hip replacement system (hereafter "DePuy Pinnacle" or "Pinnacle").[3]

17.     The ASR's design was predicated upon the design of the Pinnacle such that J&J claimed that the ASR was "Substantially Equivalent" to the Pinnacle "based upon the similarities in design, material composition, and intended use/indications for use."[4]

---

[3] "J & J's role in Ultamet's design, promotion, and sale demonstrates that J & J significantly contributed to the product's placement into the stream of commerce.  On design, the record suggests J & J (a) merged DePuy with another subsidiary that developed Ultamet's precursor Ultima, (b) integrated the design teams, and (c) transferred a helpful patent to DePuy. On marketing and sale, J & J (a) reviewed, edited, and approved DePuy's Pinnacle ads, product brochures, journal articles, public statements, and representations to regulators promoting Pinnacle MoMs; (b) provided substantial funding for certain of DePuy's promotional activities; (c) independently promoted MoMs via a satellite telecast to physicians all over the country, including Texas, and a website, hipreplacement.com, which referred visitors to Texas surgeons and allowed Texas residents to have Ultamet-related information mailed directly to them; (d) referred to the product as its own; (e) granted DePuy "market clearance" to "manufacture, use, and sell" Ultamet worldwide; (f) placed its logo on the packaging of the product as received in Texas; and (g) "monitored" Texas surgeon-consultants promoting Ultamet. Also, DePuy generated considerable revenue for J & J's subsidiary Medical Device & Diagnostic. Finally, although it is neither necessary to nor determinative of the jurisdictional question, we note that both the district court and jury found, under Texas tort law, that J & J was a "seller" of Ultamet. This combination of factors—collectively showing that J & J participated in developing Ultamet, greenlighted its sale worldwide, held the product out as its own, independently promoted the product, exercised ultimate controlling authority over the product's design and promotion, and derived revenue from its sale—is sufficient to show that J & J was a link in the stream-of-commerce chain.  These factors also distinguish J & J's role from the passive parent-subsidiary relationship that we have held insufficient to support jurisdiction." *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 779-80 (5th Cir. 2018)

[4] Available at https://www.accessdata.fda.gov/cdrh_docs/pdf4/K040627.pdf (last accessed Jan. 18, 2022).

18. ASR and Pinnacle systems and components sold for thousands of dollars, each.

19. ASR and Pinnacle systems sold for a premium over other types of hip replacement systems on account of their MoM articulating components.

20. J&J and Distributor marketed these systems based upon purportedly significant advantages over other hip replacement systems, including non-MoM systems.

21. Upon information and belief Distributor, including MATTEW N. BROWER and RONALD T. COOK, in their personal capacity, owned the exclusive rights to market all of J&J's medical devices, including both the Pinnacle and the ASR systems, to the geographic region of medical providers which included Plaintiff's surgeon.

22. Upon information and belief, the sales representative agreement executed between J&J and Distributor was signed by MATTHEW N. BROWER and RONALD T. COOK in their personal capacity.

23. Thus, MATTHEW N. BROWER and RONALD T. COOK, are personally liable for the claims asserted herein because the representations, misrepresentations, actions, and inactions of Distributor described herein are attributable to not only BAYSIDE ORTHOPAEDICS, INC., but also to both individuals in their personal capacity.

24.     Distributor and their sales agents, being in the operating room with the surgeons in their geographic region, developed relationships of confidence and trust and it was not uncommon for them to become valued colleagues and friends.

25.     Surgeons relied on Distributor and their sales agents, to not only provide product and support, but also to keep them abreast of product information including adverse product trends.

26.     Distributor sold at least *hundreds if not thousands* of Pinnacle and ASR systems and components.

27.     On these sales, Distributor made substantial commissions amounting to hundreds of thousands, if not *millions* of dollars simply from the sale of these two products.

28.     Distributor earned these lofty commissions through extensive marketing of these products not only to surgeons, but also outpatient surgery centers and hospital system administrators.

29.     When an ASR or Pinnacle product was to be used in an implant surgery, the surgeon was able to approximate the components that would be needed, however, until the surgery was underway, the exact component is not ascertainable. Because of the uncertainty which stems from the medical process, the Distributor or one of its agents, was required to use its education, training, skill and experience to select and have available, an inventory of  appropriate types and sizes of system components and tools for each surgery.  The sales representative would be present

to distribute the components, provide tools and trouble shoot the surgery with the surgical staff.

30.     When and ASR or Pinnacle product was to be revised or removed in a revision surgery, the surgeon would be guided by radiological studies as what the surgery would entail, however, the extent of any injury damage to a patient's anatomy could not be known until the patient's hip was opened in the operating room.   Because of this uncertainty, the Distributor or one of its agents, was required to use its education, training, skill and experience to select and have available, both an inventory of appropriate tools (such as proprietary removal tools which were loaned for the surgery) and an inventory of appropriate components compatible with the existing product for implantation.   Revision surgeries are more complicated, pose novel and difficult circumstances a surgeon may not have encountered and necessitates input from the Distributor who has an advanced level of knowledge and experience with the product and tools because they have been in hundreds or thousands of surgeries where complications have arisen and surgical solutions determined.   Surgeons with failed devices also expected the Distributor and sales representatives to report complications and adverse events to the manufacturer to track the safety and efficacy of the product and report to the medical community if there was a problem with the product.

31.     During surgery, components were trialed for fit and then implant components determined.   This process required a dialogue between the Distributor agent and the surgeon.   The Distributor or agent would hand boxed components to a

11

surgical tech who would open the packaging and hand the sterilized component to a nurse who would then provide the component to the surgeon for implantation.  It is this point, where the patient's body is open and surgery is in the process of taking place, that the Distributor executes the sale of the product to the patient.

32.     The Pinnacle and ASR systems and components, like all MoM implants, release toxic heavy metals into hip implant recipients' tissue, system, and bloodstream.

33.     J&J and Distributor knew or should have known that the first generation of MoM hip replacements, which were utilized in the 1960s and 1970s, were abandoned due to toxic heavy metal poisoning resulting in tissue and bone death.

34.     Two of the main early MoM designs, which were abandoned, were the "McKee-Farrar" MoM hip system and the "Ring" MoM hip system.

35.     J&J explicitly predicated the design of its Pinnacle and ASR MoM systems on the first generation of MoM systems, including the McKee-Farrar and Ring systems, claiming that the Pinnacle is "substantially equivalent" to these systems.

36.     J&J did not conduct a single pre-market clinical test on either the Pinnacle or the ASR to analyze known clinical risks associated with MoM hip replacements.

37.     In 2010, J&J recalled their ASR system because of a "higher than expected revision rate."

38.    Distributor was an exclusive Distributor at the time of the ASR recall and assisted J&J with notifying the medical community about the recall and transitioning those using the ASR to the Pinnacle.

39.    Prior to and following the ASR Recall, instead of warning of the similarities between the articulating surfaces of the ASR and Pinnacle implants and outcomes in both sets of patients, J&J and Distributor maneuvered to distinguish the Pinnacle from the ASR based upon factors that did not weigh on the actual clinical risks of the toxic heavy metal poisoning, so as to obfuscate the similarities in clinical risk, avoid the cost of another recall, and to continue to seek profits from the Pinnacle.

40.    Despite J&J and Distributor's claims that the Pinnacle was safer and more effective than the other hip implants, both the Pinnacle and the ASR were defective and unreasonably dangerous for the same reason as the first generation: the cobalt chrome components released toxic heavy metal and debris into patient's bodies leading to a high rate of injury as well as revision (replacement) surgery compared with non-MoM implants.

41.    J&J and Distributor were aware that the Pinnacle system, like the substantially equivalent ASR, had and continues to have unreasonably high rates of negative clinical outcomes such as:

- Elevated levels of cobalt and chromium in the bloodstream;
- Tissue death and destruction;
- Bone death and destruction;
- Loosening;
- Pseudotumors;
- Severe pain, weakness and limitations on mobility;

- Higher than expected rate of failure necessitating additional surgeries to replace failed implants; and
- Systemic injury throughout the body caused by heavy metal toxicity such has heart disease; rash; hair loss; hearing loss; vision loss; memory loss; organ failure and death which non-lethal injuries persist even after the removal of the failed implants.

42.     Distributor advanced misinformation about the product within the medical community and purposefully omitted or failed to tell the medical community about the negative information known about the product so as to seduced hospital administrators and surgeons, including Plaintiff's hospital and surgeon, to utilize the Pinnacle.

43.     In fact, In Johnson & Johnson's 2020 Annual Report to shareholders, Johnson & Johnson confirms financial and legal responsibility for the product liability suits related to the Pinnacle product. [5] Further, Johnson & Johnson has already been held liable (including as a "seller" of the device) for compensatory and punitive damages related to injury stemming from the Pinnacle product by three separate juries in MDL bellwether jury trials.[6]

44.     Plaintiff was implanted with the Pinnacle and has suffered substantial injuries and damages due to the defects and unreasonable danger from the system.

_____

[5] Johnson & Johnson, *Form 10-K, Annual Report Purusant to Section 13 of the Securities Exchange Act of 1934, for the fiscal year ended January 3, 2021*, at pp. 84-85, available at: https://johnsonandjohnson.gcs-web.com/static-files/e2a329b4-aeb6-438d-a449-f0e282cf8ee0 (last accessed September 15, 2021) (discussing DePuy Pinnacle and ASR litigation, final resolution of DePuy Pinnacle verdicts, and ongoing potential liability related to said products).
[6] *See In Re: DePuy Orthopaedics, Inc. Pinnacle Hip Implant Products Liability Litigation*, MDL 2244, Case No. 3:11-cv-02800-K ( March 17, 2016);   *In Re: DePuy Orthopaedics, Inc. Pinnacle Hip Implant Products Liability Litigation*, MDL 2244, Case No. 3:15-cv-03484-K (December 1, 2016); and *In Re: DePuy Orthopaedics, Inc. Pinnacle Hip Implant Products Liability Litigation*, MDL 2244, Case No. 3:15-cv-03489-K (November 16, 2017).

These injuries were proximately caused by J&J's failure to properly test its MoM implants, including the Pinnacle, as well as J&J's and Distributor's failure to properly warn the public and Plaintiff's surgeon regarding the known dangers of the Pinnacle.  Further, these injuries were proximately caused by J&J and Distributor's fraudulent, intentional, and/or negligent omissions and misrepresentations regarding the clinical risks and benefits of the Pinnacle.

## IV.  ALLEGATIONS

### A. Metal on metal hip replacements were tried *and abandoned* decades ago.

45.    In the 1960s and early 1970s, hip replacement manufacturers first began to market MoM hip replacements to surgeons.

46.    Unfortunately, these early MoM hip replacements caused a high rate of heavy metal poisoning resulting in tissue death, bone loss, and early failure of the implant.

47.    When the metal cup and metal head of these implants rubbed together, they released toxic heavy metal cobalt and chromium debris into the body.

48.    The cobalt and chromium debris resulted in patients suffering heavy metal poisoning, causing tissue and bone death.

49.    These implants failed early, failed often, and were not as safe or effective as implants utilizing metal-on-plastic components or other alternative designs.

50.    As a result of the harm seen in the early generation of MoM hip systems, the medical community abandoned MoM hip systems in the 1970s.

**B. J&J used a loophole to revive metal on metal hip replacements and avoid testing for known dangers.**

51.     Despite the prior failure of the first generation of MoM hip replacements to perform as intended, J&J nonetheless began designing another generation of MoM hip replacements in the late 1990s and early 2000s.

52.     This included both the Pinnacle and, later, the ASR systems.

53.     Despite their knowledge that early MoM hip replacements were a failure and resulted in heavy metal poisoning, J&J conducted only limited testing of the Pinnacle and ASR, including no clinical testing, before selling them for surgical implantation into the bodies of patients.

54.     To avoid comprehensive testing of either the Pinnacle or the ASR, J&J claimed to United States regulators that these systems should be "grandfathered-in" because they were substantially similar to systems sold prior to May 28, 1976.

55.     This loophole required no testing for safety or efficacy.

56.     J&J did not conduct any pre-market tests on either the ASR or the Pinnacle systems for safety or efficacy.

**C. Premarket testing for safety and efficacy would have revealed the unreasonable risk of heavy metal toxicity.**

57.     Had J&J conducted testing relevant to the safety and efficacy of MoM implants before the Pinnacle was first released in the early 2000s, J&J would have affirmatively discovered that the MoM Pinnacle system releases high amounts of toxic heavy metals resulting in an unreasonable risk of harm and revision surgeries.

58.     J&J relied upon laboratory wear testing designed for plastic components to claim that its MoM Pinnacle produces low metal wear.

59.     J&J knew or should have known that such testing does not produce reliable data regarding clinical safety or efficacy for MoM implants.

60.     J&J misused clinical data from other hip replacement systems, including non-MoM implants as well as first-generation MoM implants.

61.     J&J knew or should have known that clinical data from these other hip replacement systems did not support the safety or efficacy of clinical use for the Pinnacle.

62.     J&J knew or should have known that what little laboratory tests they relied upon to market the Pinnacle did not reasonably represent clinical use and therefore did not provide reasonably reliable data for the safety or efficacy of the Pinnacle.

63.     J&J knew or should have known that a design based upon the failed first-generation MoM hip systems, and a reliance on testing standards utilized for implants with a plastic articulating surface, would expose patients to an unreasonable risk of harm.

64.     Internal documents dating back to 1995 show J&J's knowledge of MoM articulations producing metal wear particles, metal ion release, and poor wear results including scratches creating peaks and valleys on the surfaces of the articulating components.

**D.  The Pinnacle hip system is unsafe.**

65.     The Pinnacle system was developed to reconstruct diseased human hip joints suffering from conditions such as osteoarthritis, rheumatoid arthritis, avascular necrosis, and fracture, among other degenerative conditions.

66.     The natural hip joint connects the femur bone of a patient's leg to the patient's pelvis. The hip joint is like a ball in a socket. The socket portion of the hip is called the acetabulum. The femoral head at the top of the femur rotates within the acetabulum.

67.     The Pinnacle system is typically comprised of five components: 1) the metal femoral stem, which is inserted inside the femur, 2) the taper adaptor, which allows the stem and head to connect; 3) the cobalt chrome metal femoral head (or ball), which connects to the top of the stem via taper adaptor, 4) the liner, against and inside of which the head moves; and 5) the metal acetabular cup (socket).  The acetabular cup, or socket, is comprised of a titanium metal alloy on its outer shell. There are various sizes of all five components.

68.     The Pinnacle system is available with a choice of liner: plastic, ceramic, or cobalt-chrome metal alloy.

69.     The cobalt-chrome metal alloy liner is branded as the "Ultamet" liner. The Pinnacle with an Ultamet liner is a "metal-on- metal" system because both articulating surfaces - the femoral head (ball) and acetabular liner (socket) - are made of cobalt-chromium metal.  For the purposes of this complaint, reference to the

Pinnacle system, generally, is a reference to the Pinnacle system utilized with a metal liner, such as the "Ultamet."

70.     The Pinnacle system is defective because it causes release of toxic heavy metals due to the articulation of two cobalt chrome metal alloy surfaces against each other.

71.     Further, the Pinnacle system is defective because the material properties of the femoral head and liner (including size, dimensions, weight, finish, clearance, etc.) result in the connection between the femoral head and the stem to be prone to unreasonably high rates of fretting and corrosion.  This process results in damage to the components, release of additional toxic heavy metal particles, trunnionosis, component failure, and the need for surgery to replace the failed components.

72.     The toxicity due to heavy metals is progressive, with greater metal release over time and increasing clinical reaction.  Unfortunately, the toxic heavy metals result in severe injury to the hip joint as well as various systemic maladies. Therefore, early intervention to remove the sources of toxicity is crucial.  The sooner the Pinnacle system is revised, the less damage is sustained.

73.     Clinical outcomes due to heavy metal toxicity from the Pinnacle can include high metal levels, metallosis, pseudotumors, infection, loosening, tissue death, bone death, neurological issues, and many other problems which present with symptoms of pain and loss of function.  If the MoM components are not removed early enough, the effects can be irreversible and permanent.

**E. J&J and Distributor misrepresented the Pinnacle to sell to more active patients when, in fact, the Pinnacle was even more dangerous for active patients.**

74.     J&J and Distributor focused their marketing strategy for the Pinnacle system for use in younger and more active patients in an effort to make the Pinnacle appear safer and more effective for general use and to increase the size of their potential market.

75.     For example, J&J and Distributor touted that the Pinnacle got "Coach K" Mike Krzyewski, coach of the US Olympic Basketball team and the Duke University men's basketball team, "back in the game:"



76.     Additionally, promotional materials show or discuss recipients of the Pinnacle using exercise machines, riding bikes, playing tennis, climbing stairs, and otherwise meeting the demands of active patients.

77. J&J and Distributor knew or should have known that there was no clinical support for their claims of advantage in more active patients.

**F. J&J and Distributor misrepresented the Pinnacle's ability to "lubricate" the moving parts.**

78. When two metal objects move against each other, lubrication is critical to minimize wear and the resulting damage to the metal objects.

79. When those two objects are moving inside the human body, and are comprised of toxic heavy metals, the reduction of that wear is more important because it is known to cause injury.

80. J&J and Distributor touted the Pinnacle's "TruGlide technology" which they claimed "allow[] the body to create a thin film of fluid lubrication between surfaces."

81. J&J and Distributor claimed that the moving parts are "fully separated" and the load, or weight, is "fully supported by the lubricating fluid."



TrueGlide™ Technology
Bearing surfaces are fully separated and the
load fully supported by the lubricating fluid.

82.     In essence, the claim was that the components were designed in such a way as to allow natural fluids in the hip to adequately lubricate the parts during motion and fully separate the metal components from contact during motion.

83.     J&J never tested whether their "TruGlide" technology actually worked in real-world use.  For example, J&J's tests involved loading test components into a machine which submerged the components in a lubricant-filled sack and then kept the implants in a narrow range of continuous motion.

84.     The tests did not replicate stopping, starting, sitting, standing, stepping up, stepping down, stepping sideways, stepping backward, crouching, tying shoelaces, laying down, or any other typical everyday motion.  Each of these motions impacts lubrication and wear differently.

85.     J&J and Distributor knew or should have known that their laboratory tests did not accurately replicate clinical conditions in the human hip joint for a MoM hip system.

86.     As a result, J&J and Distributor knew or should have known that their claims regarding lubrication were untested and made these claims to confuse the medical community into believing that the components would be adequately lubricated in clinical use.

87.     J&J's and Distributor's claims regarding lubrication, in fact, were false.

88.     The Pinnacle is not adequately lubricated during clinical use and therefore creates excessive wear of toxic heavy metals.

**G. J&J and Distributor misrepresented that the Pinnacle has 99.9% survivorship.**

89.     J&J and Distributor claimed that the Pinnacle had a "99.9% midterm survival" rate.

90.     "Survival rate" references the percentage of implants which remain implanted and do not need to be removed.

91.     Survivorship is material to the medical community's understanding of the safety and efficacy of any hip implant system.

92.     J&J and Distributor is and was aware that Pinnacle system had a higher-than-expected rate of failure and that survivorship with these systems did not reach 99.9% as they claimed.

93.     J&J and Distributor was aware of such a high number of revisions of Pinnacle implants that it rendered impossible their claims of the Pinnacle having a 99.9% midterm survivorship rate.

94.     J&J and Distributor were also aware that distributors and their sales representatives, who attend revision surgeries so as to provide replacement components, were underreporting revision surgeries.

95.     As a result, J&J and Distributor knew or should have known that this underreporting hid the true extent of Pinnacle system failures.

96.     J&J and Distributor knew or should have known that their claims of a 99.9% survivorship statistic were false.

97.     As Pamela Plouhar, PhD., former director of clinical research for Johnson & Johnson, who oversaw the clinical development of the Pinnacle MoM liner, stated during a Pinnacle MoM trial:

> Q. In other words, based on what you know today, the 99.9 percent success rate at five years is false?
> A. It's inaccurate.

*Andrews* et al, Trial Tr. Vol. 8, 173:8-10, Oct. 17, 2016.

98.     J&J and Distributor nonetheless falsely and deceptively utilized this data point to misrepresent the safety and efficacy of the Pinnacle system and increase sales.

99.     The orthopedic medical community, including Plaintiff's surgeon, relied on this representation as part of their understanding of the safety and efficacy of the Pinnacle which influenced their decision-making process involving use of the Pinnacle.

**H. J&J and Distributor advocated an unproven theory to minimize concern regarding long-term wear.**

100.     J&J and Distributor claimed that their MoM implants, both the ASR and Pinnacle, had acceptable long-term wear by citing a theory of "run-in" wear.

101.     This theory claims that MoM implants will have higher wear in the short term, and that wear will taper off and reduce in the long run so that wear will not be a clinical concern.

102.    This theory claims that the two articulating metal surfaces will "self-polish" as the microscopic peaks of each surface are sheared off during motion, purportedly creating a smoother surface.

103.    However, J&J did not adequately test either the Pinnacle or the ASR to determine that this theory was correct.

104.    In clinical use, the opposite of "run-in wear" is true.  Increased time implanted with a MoM hip is associated with increased wear.

105.    This is because the metal particles which are sheared off from the peaks become third body particulates inside the joint space.  These particulates then create deep scratches in the articulating components.  Each of those scratches, in turn, release additional third body particulates.

106.    The grinding of the components further serves to grind the third body particulates down into smaller and smaller sized particulates, until they become so small that they can only be measured microscopically.  These nano-particles can then become ionic and further toxic.

107.    J&J failed to adequately test the Pinnacle to confirm whether the run-in wear theory was applicable to the Pinnacle system.

108.    In fact, the theory does not hold true when the Pinnacle is in clinical use.

109.    J&J and Distributor knew or should have known that the run-in wear theory is not applicable to the Pinnacle.

**I.** **Distributor, specifically, proliferated the myths of lubrication, run in wear, and 99.9% survivorship with the Pinnacle.**

110.    Distributor, specifically, knew or should have known that the claims regarding the Pinnacle's lubrication were limited to laboratory settings and not clinically relevant.

111.    Nonetheless, Distributor still educated medical providers and hospital administrators in Distributor's territory, including Plaintiff's surgeon, that the Pinnacle's purported "TruGlide" technology would provide "fully supported" lubrication during use.

112.    Distributor personally witnessed, or otherwise was aware of, revisions of Pinnacle implants rendering impossible the Pinnacle having a 99.9% midterm survivorship rate.

113.    Distributor knew or should have known that this statistic was false.

114.    Distributor knew or should have known that the theory of "run-in" wear was not clinically proven to occur with the Pinnacle.

115.    Distributor knew or should have known that this messaging regarding lubrication, run-in wear, and survivorship would misrepresent the safety and efficacy of the Pinnacle.

116.    Nonetheless, Distributor proliferated these myths in the pursuit of lofty commissions and sales incentives.

117. The medical community, and Plaintiff's surgeon, relied on this information for their understanding of the safety and efficacy of the Pinnacle in making their decisions to utilize the implant.

**J. Distributor earned hundreds of thousands, if not *millions* of dollars in commissions from selling the Pinnacle and ASR MoM Systems.**

118. At all times relevant to this complaint, Distributor was the exclusive distributor for J&J's medical devices for the territory covering Plaintiff's hip replacement surgery.

119. Distributor was responsible for marketing, selling, and servicing Plaintiff's Pinnacle system to Plaintiff's medical providers.

120. Distributor stood in a position of trust and authority regarding the Pinnacle product as related to the medical community, including Plaintiff's surgeon.

121. Distributor derived substantial amounts of money from commissions on sales and sales growth incentives within its assigned territory.

122. The Pinnacle and ASR MoM implants were sold for thousands of dollars each, and at a premium compared with non-MoM systems.

123. These commissions and incentives typically ensured that Distributor earned anywhere between 25% and 50% of the sale price of the system components it sold.

124. Distributor sold hundreds, if not thousands of Pinnacle and ASR systems.

125.    Between commissions and sales incentives, Distributor likely received hundreds of thousands of dollars, if not *millions* of dollars for its work facilitating sales of Pinnacle and ASR components in its territory.

### K. Distributor was *highly trained* regarding the Pinnacle in order to earn the lofty commissions from its sale.

126.    J&J contracted exclusively with Distributor to educate hospital administrators and medical providers in Distributor's territory, including Plaintiff's orthopedic surgeon, regarding the claimed advantages of the Pinnacle system; to answer any questions Plaintiff's orthopedic surgeon had regarding the products; to assist Plaintiff's orthopedic surgeon at surgery regarding the products; to sell the products to Plaintiff through Plaintiff's orthopedic surgeon agent; to deliver the product to the operating room; to be available during the surgery to offer technical support and troubleshooting to the surgical team regarding the implant and the surgery; and to service and support the Pinnacle hip replacement after the surgery.

127.    Distributor used its best efforts to ensure the sale of Plaintiff's Pinnacle in order to earn maximum commissions and sales incentives.

128.    Distributor was trained to have superior knowledge, and held themselves out as having superior knowledge, over that of the general medical community about the DePuy Pinnacle system; including orthopedic, biomechanical, anatomic, and surgical technique training with implants and tools; product design rationale; templating; selection of complementary Pinnacle component parts; and selection of complementary J&J components that mate with Pinnacle components.

129.   Distributor was trained on how to sell to not only orthopedic surgeons, but also hospital system administrators who control purchasing.   These administrators were critical to Distributor's business model because then the hospital systems often require or recommend to surgeons within that system to utilize particular components in their practice.

130.   Distributor knew or should have known in-depth information regarding the DePuy Pinnacle system, including, without limitation, the purpose, design, testing, intended use, marketing, surgical technique, risks, benefits, and both laboratory and clinical product performance, among other things.

131.   This knowledge was not simply the result of information provided by J&J.   Much of the knowledge Distributor gained and shared about hip implants, including the DePuy Pinnacle, was the result of independently gained knowledge and direct communication between the orthopedic community and Distributor.

132.   Distributor is the eyes and ears of the Pinnacle product in the field and was expected by Plaintiff's surgeon to relay information from the medical community to J&J and from J&J to the medical community.   Distributor was in a unique position to have seen, heard, and known more about the risks, adverse events and issues encountered by the medical community even over that of J&J because Distributors were in the operating rooms, at conferences and "on the ground" witnessing adverse events with their own eyes, hearing complaints, answering questions and issues voiced by medical providers.

133. Distributor was not simply a mouthpiece for J&J or a courier service for the components. Distributor would attend conferences and workshops held by a variety of professionals and would gain knowledge about the product, product performance, patient outcomes, adverse events, surgical complications, tool usage and surgeon requests from sources independent of J&J. This knowledge was utilized by Distributor during direct contacts with the hospital administrators and medical providers, including with Plaintiff's surgeon.

134. Distributor's communications to the orthopedic community, including Plaintiff's surgeon, were in no way limited to the information provided on the Pinnacle hip packaging or labeling.

135. Distributor actively and regularly engaged in substantive interactions with the orthopedic community, including Plaintiff's surgeon, where such conversations conveyed information far beyond that which is in the documents within the product packaging.

136. Distributor served as the surgeons' primary or even only source of information regarding J&J products, including the Pinnacle and ASR.

137. Such communications and information were provided to hospital system or surgical practice administrators with the intended purpose of having that administrator either require or recommend to surgeons within that system or practice to utilize the Pinnacle system.

138. Such communications were also provided to surgeons, like Plaintiff's orthopedic surgeon, with the intended purpose of convincing and inducing Plaintiff's

orthopedic surgeon to use the MoM Pinnacle hip replacement instead of one of the competing hip replacements.

139.   At all times relevant to this Complaint, Plaintiff's orthopedic surgeon, nurses, and hospital and practice administrators relied on information and assistance from Distributor.

**L. Distributor attends surgeries to provide components, surgical tools, and to assist and troubleshoot with the surgical team during the surgery.**

140.   Distributor attends each surgery in Distributor's territory to provide implant components during surgery, bring surgical tools to be used, *and* to assist and troubleshoot with the surgical team during the surgery.

141.   The "Medical Sales College" is of the leading training institutions for medical device representatives, like Distributor.  It notes the following regarding the role of medical device sales representatives:

> The highly technical side of the job often comes in the servicing after the sale, usually around the aspects of a case.  Whether it is templating x-rays with a surgeon to determine the proper implants or guiding a surgical team during the surgery in the proper use of instrumentation and implant, the role of a sales rep in being the voice-of-the-manufacturer is critical.  In many instances, a rep will have seen more of a particular surgery, and certainly have seen it in more different situations, than anybody on the surgical team, including the surgeon.[7]

142.   J&J's own "DePuy Certification Learning Program Curriculum Guide," attached hereto as Exhibit 1, confirms the same principles in that Distributor is to be superiorly trained to be an active participant in implant and

---

[7] 2010-2011 Medical Sales College Course Catalog, at pg. 11.

revision surgeries and is to be able to troubleshoot for the medical team, when necessary, regarding the products the Distributor sells.  For example, the training provides the following:

- [S]urgical technique tips for demonstrating and *implanting* products with instructors assisting them to *learn the basic steps and procedures for implanting* their "biologics" products.  (Exhibit 1, p.7; Emphasis added).
- Primary Reconstructive Product Training School lasting six days, which explicitly covers hip implants, and trains representatives to *demonstrate how to implant each core product* including, surgical technique tips for implanting products. (Exhibit 1, pp.11-12; Emphasis added).
- An additional 3.5 day "Secondary School" training period covers how to *revise failed* implants, too. (Exhibit 1, pp. 13-14).
- Sawbones Bioskills Labs for hands-on experience with key instrumentation packages and revision techniques so that the representative may further support their surgeons … in the area of revision surgery. *Id*.
- "Advanced Sales Training" in which J&J "intended to enhance skills of the sales associate in the area of surgical techniques … and basic *decision-making regarding primary and revision surgical procedures*." (Exhibit 1, p.15; Emphasis added).
- Instructors assist students to learn the basic steps and procedures for implanting our reconstructive products.  Skills learned during these workshops are *intended to give the participants the necessary skills to enable them to verbally assist their surgeons,* nursing staff and other hospital-based customers *during surgical procedures*. (Exhibit 1, p.12; Emphasis added).

143.   Distributor was trained to, and did in fact, earn commissions and sales incentives for J&J by taking part in activities consistent with the above training.

**M. Distributor omitted critical information in its independent knowledge regarding failed MoM implants.**

144. Distributor attended numerous surgeries in which a MoM hip system, including the ASR or Pinnacle system, was revised due to a metal reaction.

145. Sometimes, a different manufacturer's MoM system would be replaced by a J&J system Distributor sold, and sometimes the failed MoM system was a Pinnacle or ASR.

146. This means that Distributor had direct and independent knowledge regarding failures of MoM implants, including the ASR and Pinnacle, which is at issue here.

147. Distributor was a direct witness to failures caused by reactions to the toxic heavy metals in the Pinnacle, cobalt and chromium.

148. Distributor was required to inform J&J within 48 hours of each occasion where they came to know that an ASR or Pinnacle implant was revised.

149. Distributor failed to report to J&J regarding each such revision of which Distributor became aware.

150. Further, of those revisions which Distributor did report, many were reported in an untimely manner or with incomplete information.

151. Distributor also failed to inform Plaintiff's surgeon of its independent knowledge regarding failures of MoM implants, including the ASR and Pinnacle.

152. Distributor knew, or should have known, that the clinical outcome of any cobalt chrome MoM system is relevant to a determination of the safety of the Pinnacle and ASR because of clinically relevant similarities in design between each MoM system.

153. This direct and independent knowledge regarding failed MoM implants meant that Distributor knew or should have known that the cobalt chrome articulating surfaces in a MoM hip system, utilized in both the ASR and the Pinnacle, represented an unreasonable danger to patients.

154. Distributor knew, or should have known, that sharing this information with hospital administrators and medical providers, including Plaintiff's orthopedic surgeon, was important to ensure that Plaintiff's orthopedic surgeon could make a proper and informed decision about Plaintiff's treatment. This includes not only the decision to implant the Pinnacle, but the need to remove it.

155. Additionally, it was common knowledge to both J&J and Distributor that the "Instructions for Use" which are provided by J&J in product packaging, are not provided to surgeons, including Plaintiff's surgeon, until the packaging is opened in the operating room and until the surgeon is already within the sterile field of the surgery. Distributor knew, or should have known, that any decision to utilize a type of implant has already been made well in advance of that surgery. For example, Distributor typically meets with its surgeons ahead of each surgery to template for the upcoming surgery. Regardless, Distributor waited until Plaintiff's body was open and plaintiff's surgery was in the sterile field of surgery to provide the "Instructions for Use" to Plaintiff's surgery for the first time. Distributor knew, or should have known, that any warnings about the risks of the device needed to have been provided to Plaintiff's surgeon *prior* to the surgery. Distributor failed to provide any information regarding risks, including the Instructions for Use, until

Distributor knew that Plaintiff's surgeon would be unable to review the information.   Regardless, the information contained with the Instructions for Use do not constitute adequate warnings regarding the risks of the Pinnacle system.

156.   Distributor knew that sharing negative information with hospital administrators and medical providers, including Plaintiff's orthopedic surgeon, about the Pinnacle's performance would negatively impact sales of the product.

157.   Distributor failed to share critical information regarding the Pinnacle to maintain sales and in Distributor's own interest.

158.   Plaintiff's orthopedic surgeon was unaware of this information material to the care and treatment of Plaintiff.

159.   Had Plaintiff's orthopedic surgeon been made aware of this information, it would have impacted the treatment and care of Plaintiff.

**N. When their "Substantially Equivalent" ASR hip system was recalled because of high failure rates, J&J doubled down on selling the Pinnacle and concealing its problems instead of investigating and recalling the Pinnacle.**

160.   Both of J&J's MoM products, the Pinnacle, and the ASR, performed poorly and injured thousands of patients.

161.   Likewise, every new MoM implant on the market, regardless of manufacturer, experienced poor clinical results with high numbers of patients exhibiting reactions to the toxic cobalt chrome heavy metals.

162.   Almost all these other MoM implants, like the ASR and Pinnacle, had their designs predicated upon the failed first generation of MoM hips.

163. The ASR failed earlier and in higher numbers than any of these already poorly performing implants.

164. In August 2010, **J&J** recalled more than 93,000 ASR hip implants worldwide, citing "higher than expected" rates of revision.

165. As early as 2007, various orthopedic surgeons made **J&J** aware of the similar failures occurring among the ASR and Pinnacle systems.

166. As early as September 2008, researchers connected the failures of the ASR to the "substantially equivalent" Pinnacle.

167. A July 2008 investigation into the performance of **J&J's** implants, including the ASR and Pinnacle hips, completed at the Norfolk & Norwich University Hospital, showed a failure rate of 16% at five years, well beyond acceptable safety standards. Failures often involved corrosion of the femoral stem, metal ion release, fluid collections, tendon rupture, dislocations, and tissue and bone death. Defendants were made aware of such failures but failed to warn patients or surgeons of such failures and **J&J** failed to recall the Pinnacle.

168. The problems with the Pinnacle system are substantially similar to the issues that gave rise to **J&J's** recall of the ASR.

169. Like the ASR which was designed by **J&J** to be "substantially equivalent" to the Pinnacle, the Pinnacle is also prone to early failure, and results in heavy metal toxicity resulting in serious health problems and the need for revision surgery.

170.    Internal documents show J&J's initial response to the failure of the ASR was to create a "crises response team" to aid in continuing to sell the Pinnacle notwithstanding the ASR recall.

171.    Internal documents show that J&J's response was to defend both the ASR and Pinnacle systems by blaming surgeon error and patient selection as the basis for higher-than-expected revision rates.

172.    When made aware of a discussion of MoM reactions at 2008 hip society meeting, the response from the DePuy hip marketing team was to "keep quiet:"

From:       Berman, Paul [DPYUS]
To:         Rhee, Michael [DPYUS]
Sent:       9/26/2008 6:49:55 PM
Subject:    Re: Hip society meeting update w/T Schmalzried

Yes. Tell her to keep quiet for now
Paul Berman
Director Hip Marketing
DePuy Orthopaedics, Inc.
A Johnson & Johnson Company
574-372-7020

From: Rhee, Michael [DPYUS]
To: Berman, Paul [DPYUS]
Sent: Fri Sep 26 13:54:18 2008
Subject: Re: Hip society meeting update w/T Schmalzried

Should I give Polly a heads up on this?

[8]

173.    Because of the high costs of the ASR recall, J&J made a calculated decision not to recall the Pinnacle despite the public harm that it caused and continues to cause.

_____

[8] Excerpt of Plaintiff's Admitted Exhibit PLT-00062; *see also Alicea* et al, Listing of Exhibits Submitted To The Jury And Demonstrative Exhibits Admitted During Trial, Case 3:15-cv-03489-K, Doc. # 229, Nov. 14, 2017.

174.    In a document leading to J&J's decision to recall the ASR, J&J stated that: "Main issues are not 'losing surgeons to competition,' but 'making up for revenue loss caused by down-selling... - We successfully converted most ASR surgeons to Pinnacle."[9]

175.    J&J's explicit decision was to disguise the similar failures among the recalled ASR and the Pinnacle, and continue selling the Pinnacle for continued revenue.

176.    The decision to ignore and conceal Pinnacle failures in favor of continued sales is evidence by J&J's 2011 "Hip Patient Education Packet" which was intended to "restore surgeon and patient confidence" after the ASR recall.[10]

177.    The "Hip Education Packet," continued to advertise the Pinnacle MoM system as "particularly useful for active patients," touted the Pinnacle MoM system's durability, included the false 99.9% survivorship claim, and included the false true fluid film lubrication claim.[11]

178.    Eventually, J&J did cease to sell the MoM Pinnacle system in 2013, claiming that it was solely due to declining demand for the product and not related to safety.

---

[9] Excerpt of Plaintiff's Admitted Exhibit PLT-00065; *see also Alicea* et al, Listing of Exhibits Submitted To The Jury And Demonstrative Exhibits Admitted During Trial, Case 3:15-cv-03489-K, Doc. # 229, Nov. 14, 2017.

[10] Excerpt of Plaintiff's Admitted Exhibit PLT-00033; *see also Alicea* et al, Listing of Exhibits Submitted To The Jury And Demonstrative Exhibits Admitted During Trial, Case 3:15-cv-03489-K, Doc. # 229, Nov. 14, 2017.

[11] *Id.*

179.   Despite a recall of their other MoM system, the ASR, and knowledge that the Pinnacle represents a similar unreasonable risk of harm to patients, J&J continues to misrepresent the Pinnacle as a high-quality, safe, and effective hip replacement product.

180.   As described above, J&J has taken affirmative steps to conceal the defects with the Pinnacle system. This is apparent through its continued efforts to promote and defend the Pinnacle system as a safe and effective hip replacement product despite the recall of the substantially equivalent ASR, and its efforts to silence concern regarding reactions to metal wear, as apparent in the Director of Hip Marketing's 9/6/2008 email instructing employees to "keep quiet" about clinical risks impacting patients.

181.   Plaintiff's ability to bring these claims was delayed due to J&J's efforts to conceal the defects with the Pinnacle system.

**O.  Distributor took part in the recall of the ASR yet failed to inform surgeons of the same risks with the Pinnacle.**

182.   Distributor assisted in the 2010 recall of the ASR, particularly as it related to the medical community in its territory.

183.   Distributor knew or should have known, through its extensive training, that the design of the ASR was based upon the Pinnacle to such a degree that J&J deemed it to be "substantially equivalent."

184.   Distributor knew, or should have known, that the recall of the ASR implicated a safety concern for the Pinnacle, as well.

185.   Using both information provided by J&J as well as information Distributor independently gained through discussions with medical professionals, lectures, medical reports, and attendance at surgeries of failed MoM implants, Distributor unreasonably distinguished the Pinnacle from the ASR to medical professionals in its territory in an effort to continue to profit from the commissions and sales incentives tied to the sale of Pinnacle implants.

186.   Distributor shared information it knew, or should have known, to falsely contrast the ASR and Pinnacle to convince the medical community that the Pinnacle system was safe.

187.   Distributor omitted information regarding the ASR recall and similarities between the ASR and Pinnacle which it knew, or should have known, would be important to share with medical providers, hospital administrators, and Plaintiff's surgeon in order to make proper decisions about patient care, including for Plaintiff.

188.   Plaintiff's orthopedic surgeon was unaware of this information material to the care and treatment of Plaintiff.

189.   Had Plaintiff's orthopedic surgeon been made aware of this information, it would have impacted the treatment and care of Plaintiff.

**P. Distributor was intricately involved in the sale and implant of Plaintiff's Pinnacle.**

190. Distributor was responsible for answering any questions or concerns Plaintiff's orthopedic surgeon had regarding the Pinnacle system and updating Plaintiff's surgeon regarding newly learned information about the Pinnacle.

191. Prior to Plaintiff's surgery, Distributor provided information to Plaintiff's orthopedic surgeon regarding the Pinnacle. This included information intended first to ensure Plaintiff's surgeon utilized the Pinnacle over any competitor's products and over less expensive non-MoM hip replacements sold by Distributor.

192. Unfortunately, this meant that Distributor provided false information regarding the purported benefits of the Pinnacle, as well as omitted critical information regarding its risks in an effort to profit from the sale of the implant.

193. In preparation for Plaintiff's hip replacement surgery, Plaintiff's orthopedic surgeon contacted Distributor to notify it of the need for hip replacement components and instruments.

194. Additionally, Distributor met with Plaintiff's orthopedic surgeon to template for the upcoming surgery and confer with the surgeon regarding appropriate sizes, parts, instruments, and techniques.

195. Distributor then selected and delivered the specific components and surgical instruments to be available during the surgery to the operating room where Plaintiff's surgery took place.

196.   Distributor attended Plaintiff's surgery to provide the inventory of implant components as well as surgical instruments to utilize during implantation and any other assistance as requested by Plaintiff's surgeon and surgical staff.

197.   At all times relevant to this Complaint, Plaintiff's orthopedic surgeon, nurses, and hospital and practice administrators relied on information and assistance from Distributor.

198.   Such communications and information were provided to Plaintiff's orthopedic surgeon with the intended purpose of convincing and inducing Plaintiff's orthopedic surgeon to use the MoM Pinnacle system instead of any other hip replacement.

## V.   USE OF THE PRODUCT

199.   Plaintiff was implanted with a MoM Pinnacle system, in his left hip, on November 4, 2010, in Tampa, Florida, at Tampa General Hospital and under the care of Michael Adler, MD.

200.   Plaintiff was implanted with a MoM Pinnacle system, in his right hip, on April 21, 2011, in Tampa, Florida, at Tampa General Hospital and under the care of Michael Adler, MD.

201.   Over the ensuing years, Plaintiff suffered heavy metal poisoning from the toxic heavy metals released by the bilateral Pinnacle Systems resulting in injury and requiring surgery to remove the defective hip replacements.

202.   In August 2021 Plaintiff visited his orthopedic doctor given ongoing hip pain. A Cobalt and Chromium metal ion test was administered and levels for both

heavy metals were elevated. An MRI was also administered, and a pseudotumor was discovered. Thus, Plaintiff was recommended for revision surgery.

203.    This was the first notice to Plaintiff that the Pinnacle systems may have failed, may be injuring Plaintiff, and had to be removed from Plaintiff's body.

204.    Plaintiff expected the implants to last at least twenty years, and certainly beyond twelve years.

205.    The nature of injury related to exposure to metal ions and metal debris from the Pinnacle system is such that Plaintiff could not become aware of the injury until the manifestation of injury during and after revision surgery.

206.    Defendants' affirmative steps to conceal the defects of the Pinnacle system did, in fact, cause the defects to be concealed from Plaintiff, delaying Plaintiff's ability to seek treatment as well as file suit.

207.    On November 18, 2021, in Tampa, Florida, Plaintiff was forced to undergo surgical removal of the defective right hip Pinnacle system due to heavy metal poisoning, at Tampa General Hospital under the care of Thomas Bernasek, MD.

208.    Plaintiff's right hip revision involved, in part, removal of "metal debris and pseudotumor tissue" all due to toxic heavy metal/metal ion cobalt and chromium poisoning.

209.    On March 8, 2022, in Tampa, Florida, Plaintiff was forced to undergo surgical removal of the defective left hip Pinnacle system due to heavy metal poisoning, at Tampa General Hospital under the care of Thomas Bernasek, MD.

210.   Plaintiffs left hip revision involved, in part, removal of a "large gush of black fluid," and grafting of an "osteolytic lesion," all due to toxic heavy metal/metal ion cobalt and chromium poisoning.

211.   Plaintiff continues to undergo the slow process of recovery from the surgery that would not have been necessary but for the defective nature of the Pinnacle hip system.

212.   As a direct and proximate result of the defective Pinnacle hip, Plaintiff was required to undergo surgical removal of the defective devices, now has hip replacements with decreased longevity, and suffered injuries, including but not limited to significant pain, tissue destruction, bone destruction, metal wear, and toxic heavy metal poisoning.

213.   Plaintiff expects to continue suffering such injuries in the future because of the injuries received from the bilateral Pinnacle hips.

214.   As a direct and proximate result of the defective Pinnacle hips, Plaintiff incurred medical expenses and expects to incur additional medical expenses in the future.

215.   As a direct and proximate result of the defective Pinnacle hips, Plaintiff experienced emotional trauma and distress and is likely to experience emotional trauma and distress in the future.

216.   The mechanism of failure in Plaintiff's devices was a mechanism of failure that Defendants had marketed and warranted would not occur because of the Pinnacle's design and composition.  It was also the same failure mechanism that the

medical and scientific community had been studying and documenting since the 1960's and 70's, i.e., metal wear and heavy metal poisoning resulting in tissue death, bone loss, and early failure of the implant.

217.   Moreover, the symptoms and findings associated with Pinnacle failures that have been reported in the medical literature are identical to those Plaintiff suffered.

218.   As a direct and proximate result of Defendants' defective design, manufacturing, marketing, distribution, sale, servicing, and warnings of the defective Pinnacle implant, Plaintiff has suffered and continues to suffer both injuries and damages, including, but not limited to: past, present and future physical and mental pain and suffering; physical disability; past, present, and future medical, hospital, rehabilitative, and pharmaceutical expenses; and other related damages.

## VI.    CAUSES OF ACTION

### COUNT ONE — STRICT LIABILITY FAILURE TO WARN — ALL DEFENDANTS

219.   Plaintiff re-alleges and incorporates by reference all paragraphs in Sections I-V above as if fully stated herein.

220.   At all times relevant to this action, while Defendants engaged in the business of designing, manufacturing, selling, marketing, promoting, and placing into the stream of commerce the Pinnacle hip system, the product contained defects that made them unreasonably dangerous beyond the expectations of the ordinary consumer, such as Plaintiff, and were unfit for their intended use.

221. The Pinnacle reached Plaintiff without substantial change in the condition in which it was designed, developed, promoted, manufactured, and sold.

222. At the time and on the occasions in question, the Pinnacle was being properly used for the purpose for which it was intended, and such device was in fact defective, unsafe and unreasonably dangerous.

223. The foreseeable risk of harm from the defects in the Pinnacle MoM hip system could have been reduced or avoided by providing adequate instructions or warnings.

224. At all times relevant to the action, the dangerous propensities of the Pinnacle were known to Defendants or were reasonably and scientifically knowable to them, through appropriate research and testing by known methods, at the time they distributed, supplied, or sold their respective product, and not known to ordinary consumers.

225. The Pinnacle was defective and unreasonably dangerous in that the labeling was insufficient to warn users of the hazardous conditions posed by said items, including but not limited to its propensity to cause permanent tissue and muscle death associated to release of heavy metal ions.

226. The Pinnacle was defective due to inadequate, or the absence of, warnings or instructions, including warning stickers, placards, or proper documentation to alert users regarding the hazards posed by the Pinnacle.

227. Defendants had a duty to warn, including a continuing post-sale duty to warn, regarding the unreasonable risk of harm associated with the Pinnacle,

particularly due to the progressive nature of the risk of the toxic heavy metal poisoning.

228. Defendants failed to exercise reasonable care to inform Plaintiff, Plaintiff's doctors, and the medical community about dangers regarding the Pinnacle.

229. As a direct and proximate result of the lack of reasonable and adequate instructions or warnings regarding the defects in the Pinnacle, Plaintiff suffered the injuries described in Section V, above.

## COUNT TWO — STRICT LIABILITY DESIGN AND MANUFACTURING DEFECT — ALL DEFENDANTS

230. Plaintiff re-alleges and incorporates by reference all paragraphs in Sections I-V above as if fully stated herein.

231. At the time that defendants designed, manufactured, promoted, marketed, sold, supplied, distributed and/or serviced the products at issue in this Complaint, such components contained defects that made them unreasonably dangerous beyond the expectations of the ordinary consumer, and were unfit for their intended use.

232. The Pinnacle reached Plaintiff without substantial change in the condition in which it was sold.

233. At the time and on the occasions in question, the Pinnacle was being properly used for the purpose for which it was intended, and such device was in fact defective, unsafe, and unreasonably dangerous.

234. As a direct and proximate result of the defects in the Pinnacle, Plaintiff suffered the injuries described in Section V, above.

## COUNT THREE — NEGLIGENT MISREPRESENTATION — ALL DEFENDANTS

235. Plaintiff re-alleges and incorporates by reference all paragraphs in Sections I-V above as if fully stated herein.

236. Defendants made statements concerning material facts which Defendants may have believed to be true but which in fact were false, or otherwise omitted material facts.

237. Defendants were negligent in making such statements because they knew or should have known the statements were false or omitted material information.

238. In making these statements, Defendants intended or expected that another would rely on the statements.

239. Plaintiff, through their surgeon agent, justifiably relied on the false statements.

240. As a direct and proximate result of the misrepresentations regarding the Pinnacle hip system, Plaintiff suffered the injuries described in Section V, above.

## COUNT FOUR — NEGLIGENCE — DISTRIBUTOR

241. Plaintiff re-alleges and incorporates by reference all paragraphs in Sections I-V above as if fully stated herein.

242. The Distributor Defendants marketed, promoted, advertised, sold,

distributed, serviced, and supported the Pinnacle for implantation into the bodies of consumers such as and including Plaintiff.

243.   Sales representatives working for the Defendants were responsible for educating and continuously guiding surgeons regarding the proper patient selection, surgical planning, component selection, surgical technique, and post-surgery follow-up.

244.   Surgeons, such as Plaintiff's surgeon, reasonably relied upon Defendants to properly perform these functions and Defendants had a duty to perform such functions and to protect Plaintiff from injury.

245.   Defendants failed to properly perform these functions as described above, thereby breaching their duty to protect Plaintiff from injury.

246.   Plaintiff suffered actual injury and loss because of said breach.

247.   Defendants' failure to discharge these duties were a direct and proximate cause of Plaintiff's injuries as described in Section V, above.

### COUNT FIVE — NEGLIGENCE — J&J DEFENDANTS

248.   Plaintiff re-alleges and incorporates by reference all paragraphs in Sections I-V above as if fully stated herein.

249.   The J&J defendants designed, tested, distributed, manufactured, promoted, advertised, sold, and marketed the Pinnacle for implantation into consumers such as Plaintiff by surgeons.

250.   The J&J defendants were negligent and careless in the design, testing, distribution, manufacture, promotion, advertising, sale, and marketing of the

Pinnacle.

251. The **J&J** defendants had a duty to perform adequate evaluation on the safety and efficacy of the Pinnacle. This included by reasonably gathering and reporting information regarding complaints and revisions and conducting adequate analysis on the information gathered.

252. The **J&J** defendants further had a duty to share the results of its evaluation so that Plaintiffs, Plaintiffs' orthopedic surgeon, and the orthopedic community could be adequately apprised of the risks of the Pinnacle.

253. The **J&J** defendants failed to adequately evaluate the safety and efficacy of the Pinnacle.

254. The **J&J** defendants failed to adequately share the results of its evaluations of the Pinnacle with Plaintiff, Plaintiff's orthopedic surgeon, or the orthopedic community.

255. Instead of acknowledging the uncertainties and dangers of the Pinnacle, the **J&J** defendants broadcast misrepresentations about the alleged safety and superiority of Pinnacle MoM bearing surfaces throughout the orthopedic community, and through Distributor, knowing such information would be used to guide the group of <state> surgeons and consumers who would be searching for artificial hip replacement systems.

256. **J&J** Defendants supplied the false information about the Pinnacle system for the guidance of this group of surgeons and consumers, despite awareness that they lacked the level of knowledge about Pinnacle clinical safety

that they professed to have.

257. Plaintiff and Plaintiff's surgeon justifiably relied upon the misrepresentations and omissions about the Pinnacle's clinical safety in the determination that the Pinnacle was safe and appropriate for implantation in Plaintiff's body.

258. The J&J defendants' failure to properly discharge their duties were a direct and proximate cause of Plaintiff's injuries as described in Section V, above.

## COUNT SIX — INFORMATION NEGLIGENTLY SUPPLIED FOR THE GUIDANCE OF OTHERS — ALL DEFENDANTS

259.    Plaintiff re-alleges and incorporates by reference all paragraphs in Sections I-V above as if fully stated herein.

260.    Plaintiff's purchase of the Pinnacle hip system was a business transaction.

261.    The Defendants all had a pecuniary interest in the promotion, marketing, sale, and servicing of the Pinnacle hip system.

262.    The Defendants supplied false information for the guidance of others regarding the selection of the Pinnacle hip system as a safe and effective hip replacement option, as alleged above.

263.    The Defendants failed to exercise reasonable care or competence in obtaining and communicating the information supplied for the guidance of others regarding the Pinnacle hip system.

264. Plaintiff, and Plaintiff's orthopedic surgeon agent, were within the limited group of persons for whose benefit and guidance the Defendants intended to supply the information.

265. The Defendants intended for their information to influence either the transaction in which Plaintiff, through Plaintiff's orthopedic surgeon agent, purchased the Pinnacle hip system or a substantially similar transaction.

266. Plaintiff, individually and through Plaintiff's orthopedic surgeon agent, justifiably relied upon the information provided by Defendants.

267. As a direct and proximate result of the Defendants' false information, Plaintiff suffered pecuniary loss.

## COUNT SEVEN — CONSUMER PROTECTION ACT — ALL DEFENDANTS [Pursuant to the Florida Unfair Trade Practices Act, F.S. §501.201 *et. seq.*]

268. Plaintiff re-alleges and incorporates by reference all paragraphs in Sections I-V above as if fully stated herein.

269. The acts by Defendants in this cause of action include, but are not limited to, the following deceptive and unfair acts:

- Representing the Pinnacle as a device clinically proven to be safe and effective, while knowing those claims were false and without sufficient medical support.
- Representing the Pinnacle to be of a higher quality and more desirable product than other available alternatives.
- Failing to disclose adequate information about the safety and efficacy of the Pinnacle either before or after Plaintiffs' purchase.
- Knowingly providing inadequate warnings about the Pinnacle's dangerous propensities.
- Knowingly producing and publishing deceptive and misleading statements and advertisements regarding the safety of the Pinnacle

      system, while knowing of the defects and dangers associated to the Pinnacle system.

- Doing all of the above with the sole intent of selling more Pinnacle systems and creating demand for Pinnacle systems by using deceptive or untrue statements of fact about the safety and benefits of the Pinnacle system.

270. The above acts constitute unfair and deceptive trade practices as defined in F.S. § 501.202 because they constitute false, unfair, misleading, and deceptive conduct that not only creates the likelihood of confusion and misunderstanding by Florida consumers but also the inherent capacity, tendency, and effect of deceiving Florida consumers.

271. The above acts constitute unconscionable acts and practices as specified in § 501.202 because they involve deception, fraud, misrepresentation, and knowing concealment, suppression, and omission of material facts related to a product that is intended to alter the health, well-being, and mobility of a human being.

272. Defendants acted with scienter and evil motive.

273. Plaintiff reasonably and justifiably relied on the false, misleading, unfair, and deceptive oral and written statements and representations of Defendants, and as result of that reliance agreed to implantation of the Pinnacle Hip as directed and intended by Defendants.

274. Such acts occurred in the course of trade or commerce in the State of Florida.

275. Such acts affected, and still affect, the public interest of all the citizens

of the State of Florida.

276. Such acts caused injury to Plaintiff as described above. Had Defendants not engaged in unfair and deceptive conduct, Plaintiff would have not paid substantial sums for, or agreed to implantation of, the Pinnacle hip which caused Plaintiff serious injury as described in the section entitled "Use Of The Product" above.

277. Because of Defendants violations of the Florida Unfair Trade Practices and Consumer Protection Law, Plaintiff is entitled to any and all damages allowable by statue resulting from the violations, plus all permissible attorney's fees, interest, costs, expenses and such other relief and/or injunctive relief which the Court deems just and proper.

## DEMAND FOR JURY TRIAL

278. Plaintiff respectfully requests that a jury be impaneled to hear this cause of action and to award such damages as the jury finds to be fair and reasonable under the circumstances.

WHEREFORE, Plaintiff respectfully demands judgment against Defendants for compensatory damages, attorney's fees, and any other relief the Court deems just and proper.

DATED this 11th day of March 2022.

ATTORNEYS FOR PLAINTIFF

 /s/ Michael Cowgill
**Michael Cowgill, Florida Bar # 1010945**
**Michele Stephan, Florida Bar # 96628**
**MAGLIO CHRISTOPHER & TOALE LAW FIRM**
1605 Main St. Ste. 710
Sarasota, FL 34236
Phone: (888) 952-5242
Fax: (877) 952-5042
Email: mcowgill@mctlaw.com
Email: mstephan@mctlaw.com
Secondary Email: lwilliams@mctlaw.com
Secondary Email: mpowell@mctlaw.com

Filing # 145571521 E-Filed 03/11/2022 03:48:26 PM

# EXHIBIT 1

Case 8:22-cv-00963-SDM-TGW   Document 1-1   Filed 04/25/22   Page 57 of 77 PageID 74

# DePuy Certification Learning Program
# Curriculum Guide

This document offers the DePuy Sales Associate an overview of the DePuy Certification Program.

The following information is available in this guide.

- An overview of the salesforce certification program
- Eligibility
- Learning Paths
- Primary certification requirements
- Continuing education
- Course offerings
- Course overviews

### What is salesforce certification?

Salesforce certification is a program offered to the DePuy independent sales associate that brings a comprehensive approach to education. The Salesforce Certification program is comprised of two distinct components that work together to ensure that our independent agents have State of the Art Training tools to educate themselves so they may offer their hospital customers the highest level of service and professionalism.

The two components of Salesforce Certification are the educational or learning component and the accreditation component.

The educational component contains a variety of learning programs that focus on the three key product areas recognized within the salesforce. They are Reconstructive, Trauma and Extremity and Orthobiologics.

The program uses contemporary adult learning teaching methods in a variety of venues. Programs are offered in but not limited to the following formats:

PAGE 48

Case 8:22-cv-00963-SDM-TGW Document 1-1 Filed 04/25/22 Page 58 of 77 PageID 75

- Online self-directed web-based programs

- Instructor led Warsaw-Based programs

- Instructor led regional specialty training programs

- Direct TV, seminar based, etc.

The second component of the Salesforce Certification program is the accreditation arm. DePuy has enlisted Pfiedler Enterprises to act as the third-party accreditation body for certification. Pfiedler Enterprises has long been recognized as a leader in nurse and surgeon education and now offers their years of experience to DePuy's independent contractors. Pfiedler, working through **The International Association of Continuing Education and Training (IACET)**, will oversee the entire Certification program to ensure DePuy develops programs for our associates that are meaningful and bring value in furthering their education and expertise in the Orthopaedic arena.

Certification is broken up into Primary and Continuing Education. Associates have 18 months in which to earn their primary certification. Upon completion of the primary certification, the sales associate is required to earn course credits in each 12-month period following the initial 18-month program. Successful completion of the continuing education courses allows each associate to retain their certification status.

The program was designed to address the needs of new additions to our sales team as well as our existing sales associates.

The start date of the DePuy Salesforce Certification program is February 1, 2006.

### Who is eligible?

Any sales associate representing the DePuy product line who wishes to achieve certification is eligible for this program. The Certification Curriculum is designed to offer the new DePuy associate as well as the seasoned professional a path of study. The Primary Certification requirements were established to offer the sales associate three basic paths to accreditation.

### Certification Learning Paths

Three training paths are available within certification. They are: Reconstructive, Orthobiologics and the Trauma. Field management along with the associate will determine which path to pursue based on the associates area or areas of

Case 8:22-cv-00963-SDM-TGW Document 1-1 Filed 04/25/22 Page 58 of 77 PageID 76

responsibility. An associate may choose to attain certification in all three learning paths.

## How do I attain primary certification?

The sales associate attains primary certification by completing a pre-specified number of credit hours within an 18- month timeframe. The timeline for associates contracted before the start date of February 1, 2006 begins on February 1, 2006. The 18-month timeline for associates contracted after February 1, 2006 begins on their start date.

Credit hours are determined by the number of contact hours or hours spent completing each course. Ie. If an online module, including the evaluation and assessment requires 1 hour to complete, on average, the course is assigned 1 credit.

Credit hours for instructor lead face-to- face training sessions are assigned credits per the number of hours actually present at course. Ie A 2-day advanced course is assigned 16 potential credit hours.

Instructor lead face-to-face sessions require the attendee to pass an online assessment to receive credits for attendance. A passing score for all assessments is 80% or better.

### Credit requirements for primary certification are as follows:

#### Biologics Certification Track

Start date before February 1, 2006 – 20 credit hours Primary - 12 , Elective - 8

Start date after February 1, 2006 –38 credit hours – Primary -30 , Elective -8

#### Trauma and Extremities Certification Track

Start date before February 1, 2006 – 31 credit hours – Primary 23, Elective 8

Start date after February 1, 2006 – 76 credit hours – Primary 68, Elective 8

#### Reconstructive Products Certification Track

Start date before February 1, 2006 – 36 credit hours – Primary 29, Elective 7

---

3

Start date after February 1, 2006 – 84 credit hours – Primary 77, Elective 7

**\* Associates contracted before February 1, 2006 are eligible to gain credits by testing out of primary certification programs.  A score of 80% or better is required to test out of programs.**

**\* Initial certification learning opportunities include both required and elective course offerings.  Each associates requirements are listed on the homepage of <u>www.depuycertification.com</u>**

### What is Continuing Education?

Continuing education is required for all associates on a 12-month timeline following primary certification. Successful completion of continuing education requirements allows the associate to retain their certified status.  The continuing education program starts for associates contracted before February 1, 2006 on August 1, 2007 or at the completion of the primary certification if it should fall after August 1, 2007. The continuing education start date for associates contracted after February 1, 2006 begins at the end of their first 18-month period or anytime after their primary certification if it should fall after the 18-month time line. The second phase of certification consists of continuing education requirements. The associate who attains initial certification is required to complete continuing education programs to retain certification status.  Continuing education requirements must be completed within each 12-month period following primary certification.

Credit hours are determined by the number of contact hours or hours spent completing each course.  Ie. If an online module, including the evaluation and assessment requires 1 hour to complete, on average, the course is assigned 1 credit.

Credit hours for instructor lead face-to- face training sessions are assigned credits per the number of hours actually present at course. Ie A 2-day advanced course is assigned 16 potential credit hours.

Instructor lead face-to-face sessions require the attendee to pass an online assessment to receive credits for attendance. A passing score for all assessments is 80% or better.

**Credit requirements for continuing education are as follows:**

⚓ **Biologics**

Start date before February 1, 2006 – 20 credit hours

Start date after February 1, 2006 – 20 credit hours

---

4

Case 8:22-cv-00963-SDM-TGW   Document 1-1   Filed 04/25/22   Page 61 of 77 PageID 78

- **Trauma and Extremities**

  Start date before February 1, 2006 – 20 credit hours

  Start date after February 1, 2006 – 20 credit hours

- **Reconstructive Products**

  Start date before February 1, 2006 – 20 credit hours

  Start date after February 1, 2006 – 20 credit hours

**The following programs offer credits under the certification curriculum.**

- **Primary Biologics Training \***          18 credit hours
- **Advanced Biologics Training\*\***        1 day program – 8 credit hours

                                          2-day program – 16 Credit hours

- **Primary Reconstructive Training\***      48 credit hours
- **"Revision" Reconstructive \***           28 credit hours
- **Advanced Reconstructive\*\***            1 day program – 8 credit hours

                                          2-day program – 16 credit hours

- **Primary Trauma Training\***              37 credit hours
- **Advanced Trauma Training\*\***           1 day program – 8 credit hours

                                          2-day program – 16 credit hours

- **Annual Winter Meeting\*\*\***            1-2 credit hours
- **National Meetings\*\*\***                Credits based on duration
- **Regional Custom Programs\*\*\***         Credits based on duration

Case 8:22-cv-00963-SDM-TGW   Document 1-1   Filed 04/25/22   Page 62 of 77 PageID 79

**\* Programs qualify for Primary Certification Requirements.**

\*\* Programs qualify for continuing education credits.

\*\*\* Programs qualify for continuing education or elective credits.


Courses are available in a variety of learning formats. They include but are not limited to:

- Online self-directed web-based programs

- Instructor led Warsaw-Based programs

- Instructor led regional training programs

- Instructor led field-based custom programs

- Direct TV, seminar based, etc.


**The duration of the course determines the number of credits awarded.**

**The associate must complete an online evaluation and successfully complete an online assessment to receive credit for each course. A score of 80% or better is required on all assessments to achieve a passing score.**

## Course Offerings

## BIOLOGICS PRODUCT LINE

⬤ Primary Biologics Training

**Length of course: 2.5-days:**

**Learning Objectives:**

At the end of the Primary Biologics session, the participant should be able to:

- Discuss basic science terminology as it relates to blood and bone

- Describe the rationale behind the core Biologics products

- Identify indications for use of each Biologics product

- Demonstrate effective in service techniques or product applications

- Compare and contrast DePuy's product offering to the major competitors

Primary School is designed to address the needs of new associates to DePuy. The program highlights a variety of topics including basic science philosophies, product design rationale, surgical technique tips for demonstrating and implanting products. This course is designed around current adult learning principles, allowing participants to work within interactive group settings ensuring an optimal learning experience is offered to each participant.

Presentations highlight a variety of core Primary DePuy orthobiologics' products.

During Primary School, the student attends lectures given by marketing, engineering, and sales training facilitators. Interactive, hands-on labs enable participants to try out new ideas and techniques in a group-learning environment, following lectures.

Bioskills workshops are conducted for all major product lines. These activity-based workshops enable the student to work through a variety of scenarios involving surgical instrumentation and delivery systems. Instructors assist students to learn the basic steps and procedures for implanting our orthobiologics' products. Skills learned during these workshops serve to equip our sales associates with the necessary skills to support their surgeons, nursing staff and other hospital-based customers.

Products covered during Primary training include basic sciences, Osteoconductive, Osteopromotive, and Osteoinductive products.

Case 8:22-cv-00963-SDM-TGW Document 1-1 Filed 04/25/22 Page 64 of 77 PageID 81

Product management and sales training managers review competitive product offerings to allow each participant to gain an understanding of how the DePuy Biologics products compare and contrast to those of our major competitors.

The Primary School offers each attendee the opportunity to build strong fundamentals around product knowledge, surgical techniques, and competitive product offerings.

The primary classes begin Wednesday morning with an orientation, and course overview. The student is expected to arrive with basic knowledge of anatomy, biomechanics, and the Biologics primary product line.

Each attendee must complete a series of online modules that prepare him/her for the Warsaw-based program.  Online modules include an overview of basic sciences and specifics on each products design rationale. The curriculum is designed to allow learners to work at their own pace.

All sales associates must pass a pre-entrance exam with a score of 80% or better after completion of the curriculum to confirm their position in class.

Assessments are administered at the completion of the home office training. Assessments consist of varying formats. They include oral exams; paper-based test, hands-on demonstrations, or other performance based testing formats. Assessments are supplemented with nightly group assignments as well as group presentations.

A progress report is sent to each TGM and Distributor following the course to allow for continuing education in the field.  This process ensures a "closed-loop" training process.    *Course Credits:*            18 credit hours

*All participants are required to attend the entire program and pass an online assessment with a score of 80% or better to receive course credits.*

Case 8:22-cv-00963-SDM-TGW Document 1-1 Filed 04/25/22 Page 65 of 77 PageID 82

**● Advanced Biologics Training**

**Length of course: 1-2 days:**

Learning Objectives: Advanced Biologics

At the end of the Advanced Biologics session, the participant should be able to:

- Describe specific applications for targeted Biologics products

- Position DePuy Biologics products against the competition

- Describe tactics necessary to supplant the competition

- Identify surgeon best practices for applying DePuy Biologics products

- Utilize techniques to position the Biologics product line to our surgeon and OR staff customers

The advanced programs are intended to enhance skills of the sales professional in the area of science, product indications and positioning of products to that of our competitors. The program features didactic presentations by key DePuy surgeon customers.  The use of hands-on workshops enables all sales associates to work through complex issues dealing with the indications and selling scenarios of the Orthobiologics line. The goal is to increase the knowledge and comfort level with each key product.

Questions are encouraged during each module to ensure participants receive optimal learning opportunities. Surgeon consultants conduct a simulated "grand rounds" question and answer session during the program to assess the level of learning from the participants.

The course provides the attendee an opportunity to gain "advanced" product knowledge and improved methods to identify uses for each Orthobiologics product offering. The programs offer each participant the opportunity to build upon their already strong knowledge base, which was obtained through attendance of the Primary Orthobiologics curriculum, combined with their practical field experience.

Time is set aside to allow participants to relax and discuss strategies that have been successful in their territories with their peers.

This program is designed to address the needs of the sales professional with at least 1-year of Orthobiologics sales experience.

Case 8:22-cv-00963-SDM-TGW   Document 1-1   Filed 04/25/22   Page 66 of 77 PageID 83

The program is designed for the sales representatives and is highly recommended for senior associates; sales managers; TGMS and Distributors who want to enhance their understanding of the Orthobiologics product line.

*The participant is required to attend the entire program and pass an online module to obtain course credits.*

Course Credits:                    1 day program – 8 credit hours

                                   2-day program – 16 Credit hours

PAGE 57

Case 8:22-cv-00963-SDM-TGW Document 1-1 Filed 04/25/22 Page 67 of 77 PageID 84

**RECONSTRUCTIVE PRODUCT LINE**

- ⬤ Primary Reconstructive Training

- ⬤ Secondary "Revision" Reconstructive

- ⬤ Advanced Reconstructive

**Primary Reconstructive Product Training School**

**Length of course: 6 days:**

Learning Objectives:

At the end of the primary reconstructive program, the participant should be able to:

- ⬤ Identify anatomical landmarks as they relate to total joint replacement

- ⬤ Describe the movements of the body

- ⬤ Discuss the key rationale points of each core product offering

- ⬤ Compare and contrast the DePuy reconstructive product line to that of our major competitors

- ⬤ Demonstrate how to implant each core product

*The Primary Reconstructive School begins with an orientation on Monday and commences the following Saturday with an awards dinner.*

Primary School is designed to address the needs of new associates to DePuy. The program highlights a variety of topics including product design rationale, surgical technique tips for implanting products, and an overview of competitive product offerings. This course is designed around current adult learning principles, allowing participants to work within interactive group settings to ensure an optimal learning experience.

Presentations highlight a variety of core primary DePuy Reconstructive products. *Revision products are not discussed in this program. Please see the overview for the Reconstructive Secondary program.*

During Primary School, students attend lectures by marketing, engineering, and sales training facilitators. Interactive, hands-on labs, which follow all lectures, enable students to try out new ideas and techniques in a group-learning environment.

Case 8:12-cv-00963-SDM-TGW  Document 1-1  Filed 04/25/22  Page 68 of 77 PageID 85

Bioskills workshops are conducted for all major product lines. Bioskills or Sawbones workshops enable the student to work through a variety of scenarios involving our instrumentation packages. Instructors assist students to learn the basic steps and procedures for implanting our reconstructive products. Skills learned during these workshops are intended to give the participants the necessary skills to enable them to verbally assist their surgeons, nursing staff and other hospital-based customers during surgical procedures.

Products covered during primary training include primary knee, hip, extremities, O.R. medical products, cement and cement accessories.

Product Management and Sales Training Managers review competitive product offering and allow participants to compare and contrast DePuy's product offering with those of our major competitors.

The Primary School offers all students the opportunity to build strong fundamentals around product knowledge, surgical techniques, and an understanding of how DePuy's products are positioned to those of our competitors.

The primary class begins Monday morning with an orientation, and course overview. The student is expected to arrive with basic knowledge of anatomy, biomechanics, and Reconstructive primary product line.

All students must complete a series of online modules that prepare him/her for the Warsaw-based program.  Online modules include basic anatomy and biomechanics, product design rationale and surgical techniques. Online modules are designed to allow the learner to work at their own pace.

A score of 80% or better is required on all online pre-training programs.

An assessment is given at the completion of the program. The assessment may be in a variety of formats. These may include oral exams; paper-based test, hands-on demonstrations, or other performance based testing formats.   Assessments are supplemented with nightly group assignments as well as group presentations.

A progress report is sent to each TGM and Distributor following the course to allow for continuing education in the field.

 *The participant is required to attend the entire program and pass an online assessment with a score of 80% or better to receive course credits.*

<u>*Course Credits:*</u> _____          48 credit hours

---

Case 8:22-cv-00963-SDM-TGW  Document 1-1  Filed 04/25/22  Page 69 of 77 PageID 86

## Revision Product Training School

Length of course: 3.5 days:

### Learning Objectives:

At the end of the secondary revision, product training school the participant should be able to:

- Describe defect classification systems and relate them to pre-operative planning techniques

- Detail the features and advantages of the DePuy revision product offerings

- Describe techniques used to address revision hip, knee, and shoulder scenarios

- Compare and contrast the DePuy revision product line to that of our major competitors

*Secondary begins on Tuesday evening with a brief orientation and course overview. Class commences at the end of day Friday.*

Secondary School is designed to address the needs of the sales associates who have completed Primary School and has completed an additional 6-12 months in the field. The program's objective is to offer the sales associate an opportunity to gain experience with DePuy's revision hip and knee product lines.

The Secondary School allows the sales associate the opportunity to learn about DePuy's core revision products; revision technique tips key DePuy product advantages versus the competition and advanced selling techniques.

Marketing, engineering and sales training instructors present product materials via lecture.  Interactive group sessions follow lectures to ensure participants have an opportunity to "try on" the concepts presented.

Hands on workshops are conducted on core revision products. Students participate in Sawbones Bioskills Labs for hands-on experience with key instrumentation packages and revision techniques.

Instructors assist students to ensure they gain valuable skills relating to techniques and tips. Skills learned during workshops allow the sales associate to further support their surgeons, nursing staff and other hospital based customers in the area of revision surgery.

Each attendee must complete a series of online modules that prepare him/her for the Warsaw-based program.  Online modules include design rationale and surgical

Case 8:22-cv-00963-SDM-TGW   Document 1-1   Filed 04/25/22   Page 70 of 77 PageID 87

techniques for the core revision product line. Programs are designed to allow the learner to work at their own pace.

All students must pass a pre-entrance exam with a score of 80% or better after completion of the modules to confirm their position in class.

An assessment is given at the completion of the program. The assessment may be in a variety of formats. These may include oral exams; paper-based test, hands-on demonstrations, or other performance based testing formats.   Assessments are supplemented with nightly group assignments as well as group presentations.

A progress report is sent to each TGM and Distributor following the course to allow for continuing education in the field.

*The participant is required to attend the entire program and pass an online assessment with a score of 80% or better to receive course credits.*

*Course Credits:*                    28 credit hours

## Advanced Reconstructive Sales Associate Learning Centers

*Length of course: 1-2 days:*

**Learning Objectives:**

At the end of the advanced sales associates, learning center the participant should be able to:

● Discuss details relating to pre-op planning of simple and complex surgical cases

● Identify competitive advantages within the DePuy product portfolio

● Demonstrate how to template, plan and consult on product options for primary and revision scenarios

● Explain concepts relative to soft tissue balancing, biomechanics of the hip and knee

● Identify key issues facing our surgeon and OR staff customers

● Utilize techniques to position the reconstructive product line to our surgeon and OR staff customers

The advanced program is intended to enhance skills of the sales associate in the area of surgical techniques, pre-op planning, and basic decision-making regarding primary and revision surgical procedures.  The program features "Live, interactive" surgeries and didactic presentations by key DePuy surgeon customers.  Workshops are conducted in the area of pre-planning revision surgical cases.

The advanced program includes a session on competitive updates. O.S.T., Marketing and Engineering personnel offer overviews with potential selling points versus our major competitors.

The program affords the sales professional an opportunity to view live surgery moderated by surgeon consultants or in-house marketing, sales or engineering professional.

Questions are encouraged during the surgical procedures. Feedback is facilitated via a two-way communication system tied directly to the OR and viewing auditorium.

Surgeon consultants conduct a simulated "grand rounds" question and answer session during the program to assess the level of learning from the students.

The course provides the attendee an opportunity to gain "advanced" surgical technique knowledge. The program offers information that allow each participant to build upon their already strong knowledge base, which was obtained through attendance of the Primary and Secondary training Schools combined with practical field experience.

There is also time set aside in the evening to allow the representatives time to relax with their peers and discuss strategies that have been successful in their territories.

This program was designed to address the needs of the sales associate with at least 1-year of full line Reconstructive sales experience. This course has received excellent marks from attendees and field management. The program is designed for the sales representatives and is highly recommended for Regional Managers, TGM's, and Distributors who want to enhance their pre-planning and surgical technique knowledge skills.

*The participant is required to attend the entire program and pass an online assessment with a score of 80% or better to receive course credits.*

<u>Course Credits:</u>         1 day program – 8 credit hours

2-day program – 16 credit hours

**TRAUMA PRODUCT TRAINING PROGRAMS**

**Primary Trauma Product School** Length of course: 5.5 Days

**Learning Objectives:**

At the end of the trauma primary product training school the participant should be able to:

● Describe a variety of fracture classification systems

● Identify pathologies via x-ray review

● Detail the features and advantages of the DePuy trauma offering

● Describe techniques used to implant the core products within the trauma line

● Compare and contrast the DePuy trauma line to those of our major competitors

Class begins Sunday afternoon and concludes the following Thursday with the awards banquet.

Participants begin the program on Saturday morning with the product and surgical skills training, which offers an overview of the principles of Orthopaedics and Orthopaedic fracture management. This course is taught by a practicing Orthopaedic trauma surgeon.

During the core product session, the marketing staff, engineering personnel and OST sales training managers present product through didactic presentations. These lectures are followed by interactive group sessions. The purpose of the interactive sessions is to allow the participants to "try on" the new materials and see how they feel with them. It allows them to articulate what they have just heard to gather a sense of how comfortable they are with the material. presented.

Classroom training is conducted on the DePuy trauma Metallic Internal and External Fixation product lines.

Each major module is followed by a hands-on lab, which enables participants to gain direct exposure to these devices, products, and necessary instrumentation through surgical re-enactment in the bioskills or sawbones' lab.

Instructors assist students to ensure they gain valuable skills relating to techniques and tips regarding implantation of DePuy's trauma product line. Skills learned

Case 8:12-cv-00863-SDM-TGW   Document 1-1   Filed 04/25/22   Page 74 of 77 PageID 81

during workshops allow the sales associate to further support their surgeons, nursing staff and other hospital based customers in the area of trauma.

The course features competitive sessions to allow each attendee the opportunity to compare the features and advantages of DePuy products up against some of our major competitors.

This course delivers an action packed program that enables the attendee to build a strong foundation in the area of trauma products, surgical techniques, and selling skills.

*The participant is required to attend the entire program and pass an online assessment with a score of 80% or better to receive course credits.*

*Course Credits:*                                45 credit hours

<u>Advanced Trauma Sales Associate Learning Centers</u>

Length of course: 1-2 Days

Learning Objectives:

At the end of the advanced trauma sales associate learning center the participant should be able to:

- Describe topics regarding current thinking of traumatologists

- Detail the features and advantages of featured DePuy trauma product offerings

- Demonstrate the ability to implant the featured products via sawbones workshops

- Compare and contrast the DePuy trauma product line to that of our major competitors

- Utilize Techniques to position the DePuy trauma line to the surgeon and OR staff customers.

The advanced program is conducted on a regional basis throughout the United States. The concentration of the advanced program is on various clinical aspects of human medicine and Orthopaedic fracture management.  The course is intended for sales associates who have a minimum of 1-year experience in selling and servicing DePuy Trauma Products. Advanced anatomy, x-ray interpretation, and needs assessment are covered during this session.

The faculty for this course consists of surgeons from top medical institutions across the United States.

*The participant is required to attend the entire program and pass an online assessment with a score of 80% or better to receive course credits.*

<u>Course Credits:</u>          1 day program – 8 credit hours

                           2-day program – 16 credit hours

Case 8:22-cv-00963-SDM-TGW   Document 1-1   Filed 04/25/22   Page 76 of 77 PageID 83

⬇ National Meetings

Length of program: 1-2 hours

Learning Objectives:

At the end of this session, the participant should be able to:

⬛ Describe how to implement current topics into their daily contacts with their customer base

⬛ Detail the features and advantages of featured DePuy product offerings

⬛ Assist surgeon customers in evaluating key pre-operative planning techniques

⬛ Compare and contrast the DePuy product line to that of our major competitors

⬛ Utilize Techniques to position the DePuy line to the surgeon and OR staff customers.

OST offers programs at many of the national meetings such as the AAOS, winter meeting, National Sales Meeting and selected Chicago Orthopaedic Learning Center programs.

Programs focus on a variety of topics including:

⬛ Featured products

⬛ Contemporary surgical techniques

⬛ Literature reviews

⬛ Revision arthroplasty

⬛ Etc.

Programs feature presentations by in-house Marketing and Engineering staff members as well as special guest speakers. In-house personnel offer information sessions on the featured DePuy products. Surgeon consultants offer information on updated surgical implantation techniques and planning tools to allow our associates to assist their surgeon and hospital customers.

*The participant is required to attend the entire program and pass an online assessment with a score of 80% or better to receive course credits.*

*Course Credits:*                                    1-2 credit hours

Regional customized programs

Length of course: Varies with program

Learning Objectives:

At the end of the custom training, the participant should be able to:

● Discuss details of key materials presented

● Utilize Techniques to position the DePuy line to the surgeon and OR staff customers.

The OST training managers conduct custom training programs at the request of the territory offices. Sessions include primary, revision; rp, trauma, and other product related areas. Topics vary to cover the needs of the individual territory or joint needs of a region. Participants are taught using current adult learning principles including a combination of didactic presentations and hands-on workshops.

*The participant is required to attend the entire program and pass an online assessment with a score of 80% or better to receive course credits.*

*Course Credits:*          Based on actual length of program

---